*205 OPINION
By GEIGER, PJ.
This matter is before this Court on an appeal from a judgment of the Court of Common Pleas on questions of law and fact. Counsel have agreed that the case may be tried in this Court upon the evidence adduced in the Common Pleas Court as shown by the bill of exceptions.
The transcript of the docket and journal entries shows great activity upon the part of counsel in the filing of numerous motions, none of which has resulted in any question for the consideration of this Court.
In the amended petition the plaintiff, as guardian of the estate of William S. West, alleges that on May 23, 1939, said West was adjudged by the Probate Court of Montgomery County to be mentally incompetent and committed to the Dayton State Hospital; that on the 3rd day of June, plaintiff was appointed his guardian and has duly qualified as such.
For a first cause of action, the plaintiff says that on the 7th day of February, 1939, the said West entered into an agreement of trust with the defendant bank whereby he surrendered to the defendant certain property. Said agreement provided that the defendant was to hold the property as trustee for the benefit of West. The agreement further provided that said trustee should pay the net income to West during his lifetime and for the disposition of the trust fund upon the death of said West. The plaintiff alleges that at the time of the making of the agreement West was of. unsound mind and incapable by reason thereof of making or understanding the same.
A second cause of action is set out which it is not necessary to now note.
The plaintiff prays that upon final hearing the trust agreement may be revoked and the defendant ordered to pay over to the plaintiff, as guardian, the money, bonds, stocks and choses in action which defendant may be hoiclmg as trustee under said trust agreement.
The Bank answered admitting the fact that West had been adjudged mentally incompetent and that the plaintiff had been appointed his guardian. Certain other matters are admitted in reference to the second cause of action which aré not now pertinent. After making the specific denials, a general denial was entered and the prayer is that the petition be dismissed.
The cause came on for trial. Some 35 witnesses were examined resulting in a bill of exceptions exceeding 700 pages.
On March 4, 1942' the judgment of the Court was journalized that the Court upon consideration of the first cause of action finds for the plaintiff and against the defendants and that on February 7, 1939, William S. West was incompetent and by reason thereof incapable of understanding and executing the trust agreement described in the pleadings, and that said trust agreement should be set aside and held for naught.
As to the second cause of action, the Court finds that the same should be dismissed.
A motion for new trial was made and on May 12, 1942, the same was overruled and it was then ordered that the trust agreement be revoked, set aside and held for naught and that the Bank transfer to the plaintiff the money, bonds, stocks, certificates and other choses in action which de *206 fendant is holding as trustee under said agreement.
A bill of exceptions was filed and allowed and the same becomes the evidence in this Court.
Beside the lengthy bill of exceptions we find briefs which, in the aggregate, amount to 140 pages.
The Court has been at great labor in reading the testimony in this case. The question at issue is simple; whether or not Mr. West, on February 7th, 1939, had sufficient fental capacity to enter into the contract by which he made the Winters National Bank his trustee, and provided for the distribution of the income of his property during his lifetime and the final disposition of the corpus of the estate after his death. The action is that of the guardian seeking to set aside the contract on account of lack of capacity. The evidence in chief of the guardian covers nearly 400 pages, and that of the defendant, 300 pages with rebuttal of 25 pages. The case furnishes >a very apt example of a trial which should have been confined within reasonable bounds, but which extends in needless detail over inconsequential incidents and repetitious examination, the final purpose of which was to enlighten the Court on the ward’s condition on the 7th day of February, 1939. It will be impossible for the Court to comment in detail on the testimony adduced, although we have read all of it. Counsel for each side presented a summary of the evidence as each interprets it, in several hypothetical questions propounded to physicians well qualified to give an opinion. Some of these hypothetical questions may be found on pages 284, 294, 300, 313, 350, 356 of the plaintiff’s testimony and at various pages of the defendant’s testimony. An elaborate analysis of the insanity from which the ward suffered, by Dr. Fischbein, is found (Record) pages 543-592. Also Dr. Sagebiei (Record) pages 620-686 and 691, et seq.
There does not seem to be a great deal of difference in the testimony as to the circumstances surrounding the life of the ward prior to the appointment of the guardian, and without any pretense that the summation of the plaintiff’s or defendant’s testimony presents a complete picture, the Court is of the opinion that the evidence of the plaintiff discloses that the ward, a colored man, about sixty years of age, was, during his active life as a laborer, an exceptionally skilled and highly paid cement finisher. As such he had worked both in Dayton and other points to which he was taken by contractors. In his normal days he was exceedingly cautious about money matters, and was not a spendthrift, a drinker, nor one who resorted to any extravagances. He was an exceptionally faithful worker, and. his actions beyond the scope of his employment were above reproach.
At the time in question he was married to a second wife, and had two daughters by a former wife. In December, 1938, he stopped work and from that time on the whole course of his conduct became radically altered from what it had been prior to this period. Shortly before Christmas of that year his conduct became pronouncedly worse, and he began to quarrel with his wife and his two daughters, largely over money matters. He developed the delusion, among others, that the post office department had robbed him of deposits that he had made in the savings department; and the delusion that his wife consorted with other men, and that she intended to poison him in order that she might marry a younger person. *207 Shortly before Christmas he withdrew in cash, from various banks in which he had deposits, large sums of money, as much as $5000.00 from one bank, and, without cause or reason, carried the cash on his person for a short period, of time. Soon thereafter he went again to the several banks and rented safety deposit boxes in which he placed the cash that he had drawn from the deposit account. He gave a number of bonds to his daughters, and gave to each large sums of money, some evidenced- by cash, and some by the withdrawal of the money from the bank as deposited in his own name and depositing it in the name of the wife and daughters. A serious controversy arose as to the purpose of the giving of the money to the daughters, the claim being made by Mr. West that the gifts were in contemplation of death, and that when he had recovered from an illness from which he suffered in January, 1939, he demanded the money be returned to him. One daughter did return to him all that he had given to her, but the other daughter refused to do so, saying that it was an outright gift. This action of the one daughter, Lylar Mason, gave rise to a bitter feeling against her and he constantly accused her of stealing his money and became frequently violently excited. This daughter testifies that he threatened to kill her, and actually assaulted her on a number of occasions. The net result of all this family controversy was that the wife and two daughters and Mr. West endeavored to draw a contract settling their family affairs, the contract being written by Mrs. Smith, the older of the two daughters. The family arrangement caused much friction and much excitement; upon the part of West. However, shortly after that the whole family went to the office of an attorney and there .the contract was drawn by making the Winters National Bank a trustee of the funds of Mr. West. During the period between January, 1939, and the latter part of May there were many family quarrels, during which time West showed excitement and irritability, temper and unreasonable suspicion of his wife, and a fixed aversion to the daughter who had refused to return the money. All this culminated in the filing of an. affidavit of lunacy which resulted in an examination at the State Hospital by the Hospital staff on May 29th. For brief periods prior to this examination, his condition was almost normal. As a result of the examination of May 29th the Hospital staff of physicians arrived at the conclusion that he was suffering from paresis produced by syphilis. Since that time his condition has become distinctly worse, and at the time of the last examination by any physician, he was clearly insane, as evidenced by his physical and mental symptoms and his hallucinations and delusions of grandeur. One incident in connection with this was his continual claim that he should be released from the asylum so that he could go to Michigan and there build a model city on a farm that he owned in that state. He also had delusions which clearly mark him as one suffering at the present time from paresis, a mental disability such as would justify the conclusion that he is now unquestionably and permanently insane. The question is to determine whether he lacked mental capacity to make the contract on the 7th day of February, 1939, His mental illness distinctly began in December, 1938, and has continued progressively to the present time, with slight interims of comparative lucidity. One matter that especially attracts our *208 attention is the fact that he was rather browbeaten into making any family contract. He had given certain moneys to his two daughters and to his wife, and in order to have them release their claim to this money he agreed to the appointment of the trustee. He may have had this in contemplation before the differences with his family. The particular period immediately contiguous to the signing of the contract shows that he was in a highly nervous, excitable condition which clearly would mark him as one not' capable of entering into any detailed contract in relation to the rather large sums of money which he had accummulated over a long period of diligent pursuit of his trade.
We are impressed with the fact that many witnesses were presented, testifying to peculiarities, delusions, hallucinations and unusual actions upon the part of Mr. West, and without difficulty we arrive at the conclusion that upon the evidence presented by the plaintiff, as incorporated in the first volume of the testimony and other pages of the second volume, that Mr. West was at the time he made the contract incapable on account of mental deficiency, of entering into such contract.
But we have 300 pages of the defendant’s evidence contradicting that of plaintiff which we must weigh as against the evidence of the plaintiff in order that we may ultimately judge the true facts in relation to this ease.
It is important to give consideration to the plaintiff’s exhibits A, B and C and defendant’s exhibits I to 5. Exhibit C is the “yellow paper” setting out the agreement entered into by the members of the family and written by Mrs. Will Lenner Seals (Smith). This agreement is dated January 30, 1939, and briefly provides that in settlement of their family difficulties— William West agrees to take care of his wife and she agrees not to send him to jail. She is to keep the bank book and return the bonds. Lylan Mason, the younger daughter, agrees to settle for $1,000.00, and to give back the balance of her account and return the bonds and to live in the house of the ward. Mrs. Seals (Smith), the older daughter, is to have $300.00 and return the bonds, and certain suits are to be dismissed, including the application for guardianship. This is signed by West, his wife and two daughters, and though marked “Exhibit C” is chronologically the first contract of settlement.
Exhibit B is an agreement drawn by lawyers, dated January 30, 1939, between the members of the family. It recites the facts of the dispute in reference to the personal property; that William West has filed suit against his wife and also against his daughter, Lylan Mason, to recover the personal property, and that the wife has filed an application for the appointment of a guardian. The agreement further sets out twelve different stipulations which appear to be an elaboration of the tentative agreement drawn by Mrs. Smith under the same date.
Exhibit A, under date of February 7, 1939, sets out a lengthy trust agreement between William West, designated as grantor, and the Winters National Bank, designated as Trustee. This is the agreement sought to be set aside on the ground that William West on February 7, 1939, had not sufficient mental ability to transact business. This agreement is long and complicated, and we are frank to say that after having read it several times we are unable to definitely state its provisions, and it would be impossible for West, an *209 ■uneducated man, to comprehend its provisions. However, this inability to understand this particular contract is not a ground for its being declared null, if, as a matter of fact, at that time he had mental ability to understand the transaction in which he was engaged.
Briefly, the trust agreement is to the effect that West shall convey his personal property to the bank as Trustee, which the bank agrees, to manage and distribute as a trust estate, upon the conditions enumerated. The Trustee is to pay the net income to the grant- or as iong as he shall live, and upon his death the Trustee is to take certain sums from the trust estate and hold the same in trust, as provided in said agreement. These provisions relate to the payment by the Trustee of small sums to brothers and sisters of West, who reside in Kentucky. The balance of the trust estate, after providing for the above mentioned payments, is to be held in trust for Mary B. West, his wife, provided that if the parties are divorced the provisions shall be void.
Item IV of the contract provides that after the death of West and his wife, the Trustee shall hold the balance in trust for the benefit of Mrs. Will Lenner Seals (Smith), the Trustee to pay to her a fixed amount per month, and such additional amounts as in the discretion of the Trustee may be necessary to provide for her comfort. Provision is made for the distribution of the fund if she should die leaving children. Provisions are made for the protection of the Trustee in the handling of the funds and its distribution. No provision is made for the estranged daughter, Lylan Mason.
By Item VII, the grantor has certain rights to be exercised during his lifetime, — among them power to modify or revoke the agreement in whole or in part; to withdraw any part of it from the operation of the agreement. It is further provided that the rights reserved to the grantor are personal, to be exercised by him only at his personal discretion, “and as such are not subject to be exercised by any other person or by any court under any process of law for his benefit or for the benefit of his creditors.”
The power thus given to the grantor to withdraw from or modify the trust with the provision that such is personal to him, raises an inquiry as to whether this power given to the grantor may be exercised by his guardian in spite of the provision that such power is personal to him and only to be exercised at his personal discretion. However interesting this question may be we do not find it necessary to pursue it. This Court could not be deprived of jurisdiction in this action by such agreement.
The evidence disclosed in the more than three hundred pages of the second volume of the testimony relates largely to the testimony of physicians as to whether the ward had sufficient mental capacity on February 7, 1939, to enter into a contract. The testimony of the physicians is supplemented by that of a number of attaches of the banks, The Winters National Bank, and other finanacial institutions with which the ward transacted business. We may say generally that the testimony of those connected with the bank and who had personal knowledge of the ward was that during the time extending over a period of years the ward showed no indication of a mental lapse, but that he was during that time deeply interested in saving his money derived from the high wages which he was paid for his skilled operations as a ce *210 ment finisher.
In the record there are frequent hypothetical questions addressed to the physicians. While these questions are propounded frequently to various witnesses, the tenor of the hypothetical questions is practically uniform. The hypothetical questions are a complete review of thqse incidents of the ward’s life which might throw light upon his mental condition.
The contract sought to be set aside is dated February 7, 1939. On May 23, 1939, West was adjudged to be mentally incompetent by the Probate Court, and was committed to the State Hospital, and on the 3rd day of June, 1939, the plaintiff was appointed his guardian.
The patient is still in the hospital suffering from paresis a form of mental disease, the result of syphilis which ordinarily is slow in its development, although at times the resulting insanity suddenly appears, so that one who is so afflicted may often be mentally capable until the insanity suddenly develops. This ward worked at his highly skilled occupation until the latter part of December, 1938, after which time he suffered an illness which it is claimed was the occasion for his making the transfer of the personal property to his wife and daughters.
What weight is to be given to the adjudication of insanity made upon May 23, 1939, where the patient is suffering from the gradually progressive mental deterioration, is not clearly determined in Ohio.
A question thus before us is whether or not in a case such as that at bar the finding of the Probate Court that a party is insane at or near the time of the action complained of is conclusive of the persons incapacity, or merely gives rise to the presumption of mental incapacity, which presumption is rebuttable, removed on sufficient evidence. Such adjudication is competent evidence, and the Court must determine what probative force shall be given to it; in other words, whether such an adjudication is conclusive evidence of insanity or only prima facie evidence.
The law in Ohio seems to be clear that an adjudication of insanity made after a transaction is at most presumptive evidence as to the mental cápacity of the patient at the time of the transaction.
This matter is discussed in 22-O. Jur., 100, et seq.
See-Jordon v Dixon, 10 O. D. Rep., 147 (Op. by Taft, J.);
Kennedy v Wolcott, 118 Oh St, 442;
In Re, Remus, 119 Oh St, 168;
7 A. L. R., 568, et seq.
CONCLUSION
After a careful study of the' voluminous testimony in this case, and the reading of the comprehensive briefs, we arrive at the conclusion that the evidence discloses that on February 7, 1939, the ward, due to the progress of his mental sickness, did not have mental capacity to enter into the contract.
The Court below, on March 12, 1939, ordered that the trust agreement be revoked, set aside and held for naught, and that the Bank pay over to the plaintiff the property which it is holding as Trustee under said agreement.
We believe the Court below was justified in making this order, and this Court enters the same judgment with the same provisions as to payment of costs as was entered in the Court below.
BARNES 8s HORNBECK, JJ., concur.